CAMILLE M. ABATE, ESQ.
ATTORNEY AT LAW
━━●•O•●━━

Of Counsel, Nicholas Goodman & Associates
333 Park Avenue South, Suite 3A, New York, NY 10010
TEL: (212) 227-9003  •  FAX:  (212) 937-2112
c.abate71@gmail.com

April 13, 2023

<u>VIA ECF</u>

The Honorable John Cronan
United States District Judge
Daniel Patrick Moynihan Courthouse
500 Pearl Street, Courtroom 20C
New York, New York 10007

**Re: Defendant's Sentencing Submission
United States v. Natalya Shvarts, No. 20 Cr. 681 (JPC)**

Dear Judge Cronan:

  Ms. Shvarts pleaded guilty to Count 3, Wire Fraud (18 U.S.C. § 1343) on November 23, 2022, pursuant to a Plea Agreement between the government and the defendant, which stipulated a Sentencing Guidelines range of 51-63 months. In anticipation of sentence on April 27, 2023, the defendant, Natalya Shvarts, respectfully submits this letter memorandum to assist the Court in arriving at an appropriate and just sentence.

## The Offense Conduct

  During the time that she worked at Always Home Care and Life Quality Home Care ("the Agencies"), Ms. Shvarts was primarily a registered nurse coordinator. She did have two patients for whom she had acted as a home health care aide for many years, and she continued to work with them on the weekends. As a weekend home health care aid, there were times that Ms. Shvarts was not in attendance upon her patients but elsewhere, although she did provide care to them regularly. *See* PSR ¶¶ 65-67. During the week her job was to coordinate the visits of registered nurses to the patients of Always Home Care. The government does not dispute that this role was a legitimate one and that Ms. Shvarts performed this job legitimately.

  The bulk of her participation in the scheme centered around her ability to recruit patients to the Agencies. She would receive a bonus in her paycheck of $300.00 whenever a patient agreed to accept services from the Agencies. Many of the patients she recruited were no-show patients. **The PSR terms this a "cash kickback" but that is incorrect insofar as it suggests that actual cash was changing hands.** The $300 per recruited patient was labeled a "bonus" and Ms. Shvarts received it as part of her paycheck and as such, paid taxes on it. *See* 2019 and 2020 federal tax returns, attached as Exhibit A.

Additionally, **the PSR is incorrect when it asserts that Ms. Shvarts participated in a recorded conversation with cooperating witness CW-1**, who was a no-show aide. PSR ⁋ 63. In fact, Ms. Shvarts is not on any recorded conversations, and the government's evidence against her does not include any statements or admissions, but rather testimony from various cooperating witnesses who had discussions with Ms. Shvarts.

While the parties stipulated that the calculation of loss amount for guidelines purposes is between $9 million and $25 million, the projection is based on an estimate of loss, as stated in ⁋ 75 of the PSR: "The loss amount is based on a reasonable estimate of the number of no-show cases known to SHVARTS and a reasonable estimate of the losses associated with those cases." The government is relying upon cooperating witness information combined with the number of bonuses received by Ms. Shvarts.[1]

PSR ⁋ 88 states that Ms. Shvarts "is responsible for an **intended loss** amount of at least $9,500,000, which is based on the number of no-show cases known to her and a reasonable estimate of the losses associated with those cases. A 20-level enhancement is warranted, pursuant to §2B1.1(b)(1)(K)." To be clear, Ms. Shvarts did not receive in bonuses more than $9 million, but rather that is the projected loss to the government from the false billing due to her participation in this scheme. The tax returns in Exhibit A demonstrate that she received nowhere near that amount. Contrary to PSR ⁋ 88, there is likewise no evidence that she "intended" the enormity of the loss to the government.

### Sentencing Factors Pursuant to 18 U.S.C. 3553(a)

The "overarching" command of 18 U.S.C. § 3553(a) instructs district courts to "impose a sentence sufficient, but not greater than necessary" to accomplish the goals of sentencing." *Kimbrough v. United States*, 552 U.S. 85, 89 (2007). The Guidelines are advisory and are merely one factor to consider in determining an appropriate sentence. *Gall v. United States*, 552 U.S. 38, 45 (2007). In fact, courts "may not presume that the Guidelines range is reasonable" at all or that only "extraordinary circumstances . . . justify a sentence outside the Guidelines range." *United States v. Cavera*, 550 F.3d 180, 189, 199 (2d Cir. 2008) (quoting Gall, 552 U.S. at 47); *see Nelson v. United States*, 555 U.S. 350, 350 (2009) ("The Guidelines are not only not mandatory on sentencing courts; they are also not to be presumed reasonable.").

While the Court is instructed to use the Guidelines as an initial benchmark, they can and should play no role in the sentencing decision when doing so would undermine Federal sentencing objectives. *Kimbrough*, 552 U.S. at 90. As the Second Circuit has explained:

---

[1] It appears that the government's methodology was to estimate the number of no-show patients knowingly recruited by Ms. Shvarts and then project outwards exactly how many hours each patient and aide fraudulently put down on their timesheets, and how much it cost Medicaid and Medicare. While the PSR terms it a "reasonable estimate," the defense has no way of knowing how many the government estimated and how it did its estimation. There are no recorded conversations with any cooperators speaking to Ms. Shvarts, nor did Ms. Shvarts identify for these cooperators a precise number of no-show patients that she knew about when she recruited them.

> [T]he district court must form its own view of the "nature and circumstances of the offense and the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1). The sentencing judge is directed, moreover, to consider: a) the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for that offense; b) the need to afford adequate deterrence to criminal conduct; c) the need to protect the public from further crimes by the defendant; and d) the need for rehabilitation. Id. § 3553(a)(2). Additionally, district courts must take into account: the kinds of sentences available, id. § 3553(a)(3); any pertinent Sentencing Commission policy statement, id. § 3553(a)(5); the need to avoid unwarranted sentence disparities among similarly situated defendants, id. § 3553(a)(6); and, where applicable, the need to provide restitution to any victims of the offense, id. § 3553(a)(7).

*Cavera*, 550 F.3d at 188-89.

It follows that courts may consider whether a sentence based on the Guidelines does not reflect the considerations outlined in § 3553(a), reflects an unsound judgment, does not treat defendant characteristics in the proper way, or that a different sentence is otherwise appropriate. *Rita v. United States*, 551 U.S. 338, 350-51; *see also United States v. Gupta*, 904 F. Supp. 2d 349, 350 (S.D.N.Y. 2012), aff'd, 747 F.3d 111 (2d Cir. 2014) (the "irrationality" of the Guideline's focus on loss amount was clear where 20 of the defendant's 30 offense level points were due solely to the loss calculation).

Judges also "may vary [from Guidelines ranges] based solely on policy considerations, including disagreements with the Guidelines." *Kimbrough*, 552 U.S. at 101; *see also Pepper v. United States*, 562 U.S. 476, 501 (2011).

In fashioning a just sentence, a court must conduct its own "independent review of the sentencing factors, aided by the arguments of the prosecution and the defense" and exercise discretion in fitting the sentence – in this case to Natalya Shvarts's individual history and characteristics, giving "consideration [to its] own sense of what is a fair and just sentence under all the circumstances." *See Cavera*, 550 F.3d at 189; *United States v. Jones*, 460 F.3d 191, 195 (2d Cir. 2006). It is not the amount by which a sentence deviates from the applicable Guidelines range that is the measure of how "reasonable" a sentence is. *United States v. Dorvee*, 616 F.3d 174, 184 (2d Cir. 2010)(citing *Gall*, 552 U.S. at 46-47). Rather, "[r]easonableness is determined instead by the district court's individualized application of the statutory sentencing factors." *Id.*

Application of these factors here strongly supports a non-custodial sentence. If the Court deems a custodial sentence necessary, it should be no greater than the sentence Your Honor imposed on co-defendants Alina Kuptsova and Dildora Maripova – which was one year and a day – for the reasons discussed below.

1. <u>Personal History and Characteristics of Natalya Shvarts</u>

Natalya Shvarts has no criminal record. Born in Kirov, Russia in 1969, she came to the United States legally in 1999 with her son and her husband's parents to escape the discrimination that was visited upon her as a result of marrying into a Jewish family. At the time she emigrated,

she was obtaining a divorce from her husband, who was having an extra-marital affair. PSR ¶¶ 107, 109. Her son, Grigory Shvarts, is the only blood relative she has here in the United States. Her parents are deceased and her brother, Sergei Arafailov, who is unemployed and suffering from cancer, still resides in Russia. PSR ¶ 104. She has several cousins still in Russia. One of her cousins, Elena Vostrikova, was able to provide a letter confirming that Natalya left in August 1999 to come to America as a refugee.

Natalya's son, Grigory, is 33 years old and owns a caviar wholesale company. PSR ¶ 107. He came to the USA at nine years old with his mother and, as he says, "Life was never easy." Without family support, Natalya immediately went to work and held down two jobs while her son went to school. Grigory states that she "started to work in Cleaners Company during the day and waitress in a restaurant during the night. She was making just enough money so we could pay for rent and food." She began working as a home health aide in 2003. PSR ¶ 121.

Her ex-husband's sister, Alla Shvarts, also came to the USA with her parents, Natalya, and Natalya's son. Other than Grigory, Alla Shvarts is the only family she has, and knows Natalya the longest – 34 years total, with 20+ years here in the United States. Alla Shvarts knows Natalya as "an honest, lovely mother, hard worker, trusted, reliable, and very kind person." When Natalya had to take a loan out, Alla Shvarts was the guarantor. The loan was paid on time.

Two friends write in support. Valentyna Keoutova knows Natalya as her neighbor for 20 years, and finds her honest, reliable, and very kind. Yulia Shapiro Nikitin hired her in 2021 for his billing and collection services, and states that she is an "honest and responsible person, hard worker, very helpful in any tasks and a good friend."

Her current boss, Gregory Ginzburg, informs the Court that he would like to keep Natalya working because she is a "reliable, hardworking and honest employee" who "never comes late to work." This is important because, if Your Honor chooses to give Ms. Shvarts a non-custodial or otherwise reduced sentence, the Court can be assured that she will continue to be gainfully employed in a legitimate business.

All of the letters in support of Natalya Shvarts are attached as Exhibit B.

What happened in this case is a gross deviation of what Natalya Shvarts was both when she was in Russia and when she first came here. Her son, Grigory, feels that "his mother has been 'very unlucky' in life because she does not have many family members or friends. Shvarts is a quiet person who often spends her time alone. Gregory believes that his mother committed the instant offense because she did not fully understand as to how the instant offense was being committed." PSR ¶ 108. As a loyal and devoted son, he fully believes that she was somehow roped into this.

Natalya Shvarts herself, however, has acknowledged her guilt to this Court, and is extremely remorseful and aware of the magnitude of her conduct. She has been marked by this

case. Due to the severe stress she has been under, her health has deteriorated. She is currently suffering from hypertension and hypothyroidism, for which she takes medication. PSR ¶ 112. She has an inherited kidney issue. Her mother died from kidney cancer, and her brother in Russia currently suffers from kidney cancer. A few years ago she had a cyst removed from her kidney, and has been told that she will need to monitor her kidney function for the rest of her life. PSR ¶ 113. According to the National Kidney Foundation, "Stress and uncontrolled reactions to stress can also lead to kidney damage. As the blood filtering units of your body, your kidneys are prone to problems with blood circulation and blood vessels. High blood pressure and high blood sugar can place an additional strain or burden on your kidneys."[2]

Ms. Shvarts lives with her son and with two pets, a Husky dog "who is her best friend" according to her son, and "a cat who she found in a street left alone and beaten up in upstate New York."




Ms. Shvarts and her son live simply. According to the probation officer who conducted a home visit in preparation for the PSR, Ms. Shwarts and her son live in "a well-kept apartment located on the lower level of a multi-family home. Shvarts' home consists of a kitchen, bathroom, and living room, which also serves as the defendant's bedroom." PSR ¶ 110. She and

---

[2] *See* https://www.kidney.org/atoz/content/Stress_and_your_Kidneys#:~:text=Stress%20and%20uncontrolled%20reactions%20to,or%20burden%20on%20your%20kidneys.

her son live frugally, without bedrooms. Her lifestyle demonstrates that her criminal conduct did not materially enrich her.

2. <u>The Offense is an Aberration in the Life of Natalya Shvarts.</u>

As Your Honor can see by the letters written in support of Ms. Shvarts and by her personal history in general, the conduct that she participated in here does not and should not define her. She has worked hard her entire life, and has raised a productive and law-abiding son, by herself and despite her lack of financial resources for many years. Her conduct in this case was a blunder and a terrible lapse in judgment. But she has so many other good qualities, that this regrettable interlude should not be allowed to destroy the rest of her life.

As was said by Shakespeare, "Use every man after his desert, and who should 'scape whipping?" Hamlet, Act 2, Scene 2. The Supreme Court in *Pepper v. United States*, 562 U.S. 476, 487 (2011), stated that a court should consider "every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and punishment to ensue."

Courts may sentence a defendant below the Guidelines range where the offense was an aberration in the life of an otherwise upstanding and honorable individual. *See, e.g., United States v. Howe*, 543 F.3d 128, 132 (3d Cir. 2008) (affirming downward variance where defendant committed an "isolated mistake" in an otherwise "honorable and lawful life"); *United States v. Mills*, No. 88 CR. 956 (CSH), 1990 U.S. Dist. LEXIS 400, at *8 (S.D.N.Y. Jan. 9, 1990) (holding that the "long period of crime-free conduct" on the part of the defendant was a factor in awarding a downward departure from the Guidelines); *United States v. Fanfair*, No. 18-CR-00660, 2019 U.S. Dist. LEXIS 82182, at *7 (E.D.N.Y. May 13, 2019) (considering the defendant's lack of criminal history and the fact that she "has dedicated her life to her children and her younger siblings" in downward adjustment of sentence); *United States v. Ranum*, 353 F. Supp. 2d 984, 991 (E.D. Wis. 2005) (imposing below-Guidelines sentence for defendant's "otherwise outstanding character").

3. <u>The Loss Amount Overstates the Defendant's Personal Gain.</u>

A sentence that promotes respect for the law is one that is reasonable and reflects accurately the culpability and moral responsibility that the defendant bears for her own acts. In this regard, many courts dispute the weight given almost exclusively to the loss amount by the Guidelines, and the failure of the Guidelines to examine and consider moral responsibility or the nature of the individual's participation.

Courts have found a downward variance appropriate where the defendant received little or no personal benefit from the offense. *United States v. Walters*, 87 F.3d 663, 671-72, n.8 (5th Cir. 1996) (affirming a non-Guidelines sentence where loss calculation "overstates the seriousness of the particular defendant's conduct" as defendant "fail[ed] to receive a personal

benefit" from the scheme); *United States v. Oakford Corp.*, 79 F. Supp. 2d 357, 368 (S.D.N.Y. 1999) (finding that Guidelines overstated seriousness of offense where "each of the defendants personally realized only a small portion of the overall gain or profits" from scheme); *United States v. Stuart*, 22 F.3d 76, 82-83 (3d Cir. 1994) (finding that a nine-level loss enhancement may overstate defendant's criminality because he only personally received a maximum of 1.6% of the government's loss figure).

*See also United States v. Algahaim*, 842 F.3d 796, 811 (2d Cir. 2016)("Where the Commission has assigned a rather low base offense level to a crime and then increased it significantly by a loss enhancement, that combination of circumstances entitles a sentencing judge to consider a non-Guidelines sentence."), and *United States v. Adelson*, 441 F.Supp.2d 506, 509 (SDNY 2006)(discussing the "inordinate emphasis that the Sentencing Guidelines place in fraud cases on the amount of actual or intended financial loss… without, however, explaining why it is appropriate to accord such huge weight to such factors").

An amendment to the Sentencing Guidelines that went into effect on November 1, 2015 is also instructive here. The amendment to Section 2B1.1, which revised the commentary at Section 2B1.1, Application Note 3(A)(ii), redefined "intended loss" as pecuniary harm that "the defendant purposely sought to inflict." As indicated in the Official Commentary to the amendments, the amendment reflects the Commission's belief that "sentencing enhancements predicated on intended loss, rather than losses that have actually accrued, should focus more specifically on the defendant's culpability."

In other words, the Commission adopted an approach that focuses upon the subjective intent of the specific defendant, that is the "pecuniary harm that the defendant purposely sought to inflict" when evaluating a defendant's intent to inflict loss. U.S.S.G. §2B1.1, Application Note 3(A)(ii).

4. The Seriousness of the Offense

In 2014 a report was published by a special task force of the American Bar Association ("Task Force"), comprised of, among others, judges from within this Circuit, that proposed to the Commission substantial amendments to the Guidelines for economic crimes.[3] The Task Force offered a fundamental alteration of the Guidelines, substantially decreasing the focus on loss amount while properly increasing the importance of a defendant's culpability in guiding the sentencing determination. The Task Force proposal reduces the loss table from 15 tiers to six tiers and decreases the enhancement for the highest loss amount from 30 offense levels to 14.

The Task Force proposed that first-time offenders who have committed offenses that are not "otherwise serious" have a cap of level 10 in their offense level. *See* ABA Report at 6-7. The proposal sets forth a long list of factors in determining whether an offense is "otherwise serious" including, but not limited to, the following: the amount of loss; whether loss was intended at the

---

[3] *See* American Bar Association, *A Report on Behalf of the American Bar Association Criminal Justice Section Task Force on the Reform of Federal Sentencing for Economic Crimes*, Final Draft (Nov. 10, 2014), available at https://www.americanbar.org/content/dam/aba/publications/criminaljustice/economic_crimes.auth checkdam.pdf ("ABA Report").

outset of the offense conduct; whether the defendant's offense conduct lacked sophistication; the duration of the offense conduct; and the nature of the victim impact caused by the offense. *Id.*

- <u>Amount of Loss</u>. Here, the amount of loss is extraordinarily high. According to the PSR, at least 20% of the Agencies' Medicaid billings during the period of the conspiracy were attributable to fraud, estimating that number to be $60 million. PSR ¶ 71. This number is attributed as the intended loss to Marianna Levin.
- <u>Whether Loss was Intended by Natalya Shvarts</u>. We respectfully submit that no such loss was intended by Ms. Shvarts, either at the outset of the offense conduct or as it went on. She was not in a position of command and she did not know the extent of the fraud going on. She acted in a very small sphere and had no supervisory or managerial powers.
- <u>Lack of Sophistication</u>. Ms. Shvarts's lack of sophistication is evident in her transparency with regard to her earnings. She received her money as a bonus, in a regular paycheck, and she paid taxes on that money. The government was able to trace exactly how many bonuses she received precisely because she was so transparent. As stated *supra* at n.1, the government's calculation of how many of those bonuses were the result of knowingly recruiting no-show patients, versus how many were legitimate patients in need of home health aides, is neither scientific nor mathematically sound. Nevertheless, Ms. Shvarts has accepted full responsibility for her actions and has stipulated to the loss amount attributed to her.[4]
- <u>Duration of the Offense Conduct</u>. The indictment charges 12 co-conspirators in a 5-year conspiracy, from in or about 2015 until December 2020.
- <u>Victim Impact</u>. The fraud deprived Medicaid of millions of dollars, and of course the impact is felt by all taxpayers, and the entire country suffers from the waste of government dollars on this type of fraud.

5. <u>A Non-Incarceration Sentence Can Adequately Deter Criminal Conduct and Protect the Public</u>.

Natalya Shvarts, through her prosecution in this case, is now aware of the enormous cost to all of us, and deeply regrets her participation in it. While the Court must consider, as part of its sentencing analysis, what sentence "affords adequate deterrence to criminal conduct," 18 U.S.C. § 3553(a)(2)(B), a prison sentence is not necessarily the way to accomplish this goal. The collateral consequences of a conviction can serve as a powerful deterrent. *See, e.g., United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009) (sentencing court properly considered that the "conviction itself already visit[ed] substantial punishment" on defendant by likely barring him from future work in his profession); *United States v. Pauley*, 511 F.3d 468, 474-75 (4th Cir.

---

[4] In addition, Ms. Shvarts performed legitimate work as a registered nurse coordinator at the Agencies. It was not a ruse but a very critical job to arrange for nurses to visit patients at their homes. As this Court can see by the letters in support of Ms. Shvarts, she has always been a very hard worker, reliable and on time.

2007) (downward departure warranted where defendant "lost his teaching certificate and his state pension as a result of his conduct"); *United States v. Anderson*, 533 F.3d 623, 633 (8th Cir. 2008) (court properly considered "atypical punishment such as the loss of [defendant's] reputation").

Congress has specifically directed that, in considering all the §3553 factors, a sentencing court must take into account Congress's finding that imprisonment does not promote correction and rehabilitation. *See* 18 U.S.C. § 3582:

> **§3582. Imposition of a sentence of imprisonment**
>
> (a) Factors To Be Considered in Imposing a Term of Imprisonment. - The court, in determining whether to impose a term of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, shall consider the factors set forth in section 3553(a) to the extent that they are applicable, *recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation*. … (Emphasis added.)

The Supreme Court has made clear that a non-incarceration sentence is, indeed, punishment because defendants are "subject to several standard conditions that substantially restrict their liberty." *Gall v. United States*, 552 U.S. 38, 48 (2007). In addition, a sentence of probation means that the defendant "will not be able to change or make decisions about significant circumstances in his life, such as where to live or work, which are prized liberty interests," without the permission of his probation officer or the court. *Id*. at 44 (citing United States District Judge Robert Pratt's statement of reasons in *Gall* for imposing probation, rather than several years in prison).

6. Rehabilitation

A non-incarceration sentence can, in the right circumstances, be an optimal sentence, because it allows a defendant to rehabilitate in the community. As the Federal Probation Department has explained in the past, a non-incarceration sentence "holds people accountable for breaking the law" while "cost[ing] less than incarceration and giv[ing] people charged with or convicted of federal crimes the opportunity to live with their families, hold jobs, and be productive members of society."[5] Yet it does carry significant collateral consequences regardless of whether an incarceration sentence is imposed.[6]

---

[5] *See* United States Probation and Pretrial Services System-Supervision, U.S. CTS., http://www.uscourts.gov/services-forms/probation-and-pretrial-services/probation-and-pretrial-servicessupervision.

[6] *See* Margaret Colgate Love, Federal Sentencing & Collateral Consequences, COLLATERAL CONSEQUENCES RESOURCE CTR. (April 15, 2016), http://ccresourcecenter.org/wpcontent/uploads/2016/05/CCRC-Federal-Sentencing-Collateral-Consequences-4-2016.pdf.

To ensure that a non-incarceration sentence has teeth, Congress has directed that if a defendant violates the conditions of his probation or supervised release, he can be sentenced to "any . . . sentence that initially could have been imposed" in the case of probation and an additional prison term in the case of supervised release. *See* 18 U.S.C. § 3565(a)(2); 18 U.S.C. § 3583(e)(3). While some might argue that a non-incarceration sentence will not adequately deter a defendant, studies show rehabilitation and treatment reduce recidivism.[7]

**Conclusion**

As the Probation Department says in its justification for a below-Guidelines sentence, "During her involvement in the instant offense, Shvarts did not maintain a leadership role, and she did not own either of the homecare service agencies that were involved in the scheme, which gives reason to believe that Shvarts did not reap a significant portion of the scheme's ill-gotten proceeds."

The defense agrees with this reasoning but disagrees with Probation's sentencing recommendation of 36 months. We ask that the Court take into consideration all the points outlined above, particularly Ms. Shvarts's medical issues which could be exacerbated in prison, and especially with the continued prevalence of Covid-19 in the prison system. We ask that the Court impose a sentence that is non-incarceratory or no more than 366 days.

Respectfully submitted,

*Camille M. Abate*

Camille M. Abate, Esq.
Attorney for Natalya Shvarts

cc: AUSA Daniel Nessim and AUSA Nicholas Chiuchiolo (via ECF)

---

[7] Joan Petersilia, Parole and Prisoner Reentry in the United States, 26 CRIME & JUST. 479, 518 (1999).